| | |
|---|---|
| CRISTIAN NUNEZ, RICHARD BLAKE, CHRISTOPHER JORDAN, PATRICK FISHEL, HUNTER TROJNOR-HILL, YARIK TKAL, TUCKER OWEN, HUGO DOMINGUEZ, TROY SHAFFER, MICHAEL SANDERS, MYERS HERRON, SHUNFU HU individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>SUBARU OF AMERICA, INC., TOYOTA MOTOR SALES, U.S.A., INC. and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.<br><br>    Defendants. | **Case No: 1:19-cv-18303-RBK-AMD**<br><br>**AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

The allegations contained in this Complaint are based on Plaintiffs' personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based on an investigation by Plaintiffs' Counsel:

## I.        STATEMENT OF THE CASE

1.        Plaintiffs bring this class action against Defendant Subaru of America, Inc. ("Subaru") and Defendants Toyota Motor Sales, U.S.A., Inc. ("TMS") and Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") (collectively the "Toyota Defendants" or "Toyota" and collectively with Subaru, the "Defendants") because the Defendants jointly developed, manufactured and sold approximately 165,000 vehicles with a significant safety defect in the engine which leads to sudden stalling and failure of the engine, and now Defendants are directing consumers to have recall work performed which

1

Defendants represent will remedy the defect, but in reality, is worsening the sudden stalling and is causing widespread and catastrophic engine failures.

2.	Further, not only did Defendants knowingly sell defective vehicles and conceal their knowledge of the defect from the Plaintiffs and the public for years, but after being compelled to recall the vehicles for this safety defect, the Defendants are disclaiming responsibility for the catastrophic engine failures resulting from the alleged "repair" of the vehicles and are forcing consumers to bear unreasonable safety risks, costs and expenses resulting from the engine failures.

3.	Despite knowing by no later than May 2013 that the valve springs in the Class Vehicles (defined below) were defective, Defendants concealed such information and failed to disclose the defect in the Class Vehicles to the National Highway Traffic Safety Administration ("NHTSA") until November 1, 2018.

4.	Upon information and belief, Defendants intentionally concealed and did not reveal their knowledge of the valve spring defect until November 2018 in order to evade liability under their new vehicle express warranties.  Pursuant to the new vehicle warranties, Defendants were responsible for defects in the powertrain, engine and all internal parts of the engine for five (5) years or 60,000 miles from the initial sale date.  *See* **Exhibits E, F**.  The new vehicle warranties are transferrable to subsequent purchasers of the Class Vehicles.

5.	Given that the Class Vehicles are all Model year 2013, the fact that Defendants waited more than five (5) years to disclose their knowledge of the defective valve springs is more than coincidental and highlights the Defendants' devious and deceptive intentions.  But for this wrongful concealment and failure to disclose the defect when discovered, the valve spring repairs, and all associated engine damages suffered by owners and lessees of the Class Vehicles certainly would have been covered under the new

2

vehicle express warranties.

6.    As a matter of law and equity, the five (5) year/60,000 mile warranty period, as well as any statutes of limitations, should be tolled as of no later than May 2013, which is when Defendants have conceded they were aware of the defect in the valve springs — but concealed such information from the public.  Defendants made changes in the valve springs for vehicles manufactured from May 2013 forward but waited more than five years to report the defect to NHTSA.

7.    Defendants are fully informed of the dangers posed to their customers and the significant losses being suffered by them as a result of the defect in the valve springs and the Defendants' attempted repair procedures.  In addition to complaints from the Plaintiffs, the problems are being widely reported, including the online article published by "The Drive" on March 8, 2019 with the headline below:

# Scion FR-S, Subaru BRZ Owners Claim a Recall Fix Is Destroying Their Engines (Updated)

More owners are reporting problems now than during the actual recall period.

BY CHRIS TSUI   MARCH 8, 2019

8.    On March 12, 2019 "Jalopnik" published an article with the headline below:

# Scion FR-S and Subaru BRZ Owners Say Engines are Catastrophically Failing After a Recall Fix



David Tracy
3/12/19 2:25PM • Filed to: SCION FR-S ⌄



168.7K   477   3



9.        Defendants are aware of this traumatic problem, and while representing back in March 2019 that they were "investigating" the situation with catastrophic engine failures occurring after the Recall (defined below) they still refuse to accept responsibility while continuing to encourage customers to continue bring their vehicles in for the Recall Work (defined below).  Below is the statement issued by Toyota on March 14, 2019 in response to the article by "The Drive":

*U**pdate, 03/14/2019 11:35 am EDT:** In an email, a Toyota Advanced Technology spokesperson issued the following statement to* The Drive*: "The safety and security of our customers is a top priority.  We are investigating reports regarding issues involving certain Scion FR-S vehicles after the engine valve spring recall remedy was completed.  No other information is available at this time."*

*When asked whether or not the company still recommends owners of affected 2013 Scion FR-S's bring their cars in for the recall if they have not done so already, the Toyota rep responded, "Yes."*

10.        Meanwhile, as reported on July 9, 2019 by "The Star" in the article below, consumers are concerned that they are placing their lives at risk by adhering to the Defendants' directive, and in addition, they are continuing to incur substantial monetary losses:

# Owners of Scion and Subaru cars are scared a safety recall could be dangerous



By **Ellen Roseman** Contributing Columnist
Tues., July 9, 2019 | ⏱ 3 min. read

11.        Defendants mislead their customers into believing that Defendants will guaranty that the vehicles are repaired properly, are safe to operate and will be fully backed

by the Defendants when the Recall Work is performed.  In fact, in "The Star" article referenced above, Subaru spokesperson Julie Lychak was quoted as saying:

"We stand behind our product and customers in completing a proper repair," she said.

12.     Unfortunately, Defendants are not standing behind their vehicles or their customers. Consumers are left with a dilemma: continue to operate their vehicles with the defective valve springs which may suddenly fail and cause the vehicle to dangerously malfunction on a roadway, or have the Recall Work performed and risk an engine fire or other catastrophic engine failure while on a roadway.

13.     The Class Vehicles pose an imminent and significant safety hazard to vehicle operators and the public.  As also reported by "The Drive" in March 2019:



# This 2013 Scion FR-S Went Up in Flames After Valve Spring Recall
The car caught fire two weeks and 2,000 miles after having its valve springs replaced.
BY CHRIS TSUI  MARCH 15, 2019

14.     These problems prompted "Torque News" to publish an article on April 1, 2019 with the headline below:

By Denis Flierl G+ Apr 1 2019 - 6:51am

# What Went Wrong With Scion FR-S, Subaru BRZ Recall?

**This is no April fools joke, Subaru and Toyota may need to stop a recall for BRZ and Scion FR-S sport coupes. The fix is worse than the original problem.**

15.     Numerous consumers whose vehicles are suddenly and dangerously malfunctioning after having the Recall Work performed and who are being forced to pay thousands of dollars for engine repairs resulting from the defect and the Recall Work have taken the time to submit formal complaints to NHTSA. Representative complaints from consumers around the country to NHTSA include the following:

**September 19, 2019** NHTSA ID NUMBER: 11256662

## Components: ENGINE

**NHTSA ID Number:** 11256662

**Incident Date** September 19, 2019

**Consumer Location** HAUPPAUGE, NY

**Vehicle Identification Number** JF1ZNAA16D2****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | COMPLAINT ABOUT TOTAL ENGINE FAILURE AFTER BRINGING MY 2013 SCION FRS IN FOR VALVE SPRING RECALL. THE VEHICLE HAS ONLY 17,000 MILES. VALVE SPRING RECALL WAS DONE AT A TOYOTA DEALERSHIP. SEVERAL HUNDREDS MILES LATER, WHILE DRIVING, THE ENGINE LIGHT COMES ON AND MAKING KNOCKING NOISE. BROUGHT TO TOYOTA AND THEY SAID IT WAS ENGINE FAILURE. THIS DEALER DID NOT EVEN OPEN THE ENGINE TO VERIFY. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

## September 27, 2019 NHTSA ID NUMBER: 11258511
### Components: ENGINE

**NHTSA ID Number:** 11258511

**Incident Date** September 20, 2019

**Consumer Location** COVENTRY, RI

**Vehicle Identification Number** JF1ZNAA15D1****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2013 SCION FR-S. WHILE DRIVING 20 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT WAS UNABLE TO RESTART THE VEHICLE. THE VEHICLE WAS TOWED TO AN INDEPENDENT MECHANIC AND THEN TO BALISE TOYOTA OF WARWICK (1400 POST RD, WARWICK, RI 02888, (401) 352-5911) WHERE IT WAS DIAGNOSED THAT THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE VEHICLE WAS RECENTLY REPAIRED PER NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE AND ENGINE COOLING). THE CONTACT WAS CONCERNED THAT THE FAILURE WAS DUE IN PART TO THE RECALL REPAIR. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 89,000. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

## August 5, 2019 NHTSA ID NUMBER: 11241848
### Components: ENGINE

**NHTSA ID Number:** 11241848

**Incident Date** July 27, 2019

**Consumer Location** Unknown

**Vehicle Identification Number** JF1ZNAA16D1****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2013 SCION FR-S. WHILE DRIVING 50 MPH, THE CONTACT HEARD THE VEHICLE'S ROD BEARINGS SPINNING, WHICH ULTIMATELY LED TO ENGINE FAILURE. IN ADDITION, THE CHECK ENGINE AND OIL PRESSURE INDICATORS ILLUMINATED ALONG WITH OTHER UNKNOWN WARNING INDICATORS. THE VEHICLE WAS TAKEN TO VANCOUVER TOYOTA (10455 NE 53RD ST, VANCOUVER, WA 98662, (360) 944-3001) WHERE IT WAS DIAGNOSED THAT THE ROD BEARINGS FAILED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 66,000. *TT |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | THE CONSUMER STATED RECALL PERFORMED IN JAN/FEB OF 2019. *TR |

## Components: ENGINE



**NHTSA ID Number:** 11234598

**Incident Date** July 12, 2019

**Consumer Location** HAVERTOWN, PA

**Vehicle Identification Number** JF1ZNAA17D1****

### Summary of Complaint

| | | |
|---|---|---|
| CRASH | No | CAR WAS RECALLED FOR REPLACEMENT OF VALVE SPRINGS AND THIS SERVICE CAUSED ENGINE FAILURE(BEARING) PROBABLY SEALANT SEEPED INTO OIL CAUSING BLOCKAGE OF OIL FLOW |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

October 16, 2019 NHTSA ID NUMBER: 11268878
## Components: ENGINE

**NHTSA ID Number:** 11268878

**Incident Date** October 1, 2019

**Consumer Location** CHICAGO, IL

**Vehicle Identification Number** JF1ZNAA15D2****

### Summary of Complaint

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2013 SCION FR-S. THE CONTACT WAS INFORMED BY ADVANTAGE TOYOTA OF RIVER OAKS (1970 RIVER OAKS DR, CALUMET CITY, IL 60409, 708-862-0700) THAT THE VEHICLE WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE AND ENGINE COOLING). THE DEALER KEPT THE VEHICLE FOR OVER A MONTH DUE TO THE RECALL. WHEN THE VEHICLE WAS RETURNED TO THE CONTACT, IT SHOOK UNCONTROLLABLY WITHOUT WARNING. AFTER TAKING THE VEHICLE BACK TO THE DEALER ON SEVERAL OCCASIONS FOR THE SAME FAILURE, THE CONTACT WAS INFORMED THAT SHE WOULD BE CHARGED FOR DIAGNOSTIC TESTING. THE VEHICLE WAS NOT DIAGNOSED. WHILE DRIVING, THE VEHICLE SHOOK UNCONTROLLABLY AGAIN, MADE A LOUD SOUND, AND SHUT OFF WITHOUT WARNING. THE CONTACT HAD THE VEHICLE TOWED BACK TO THE DEALER. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND NOTIFIED THE CONTACT THAT THEY WOULD HAVE TO PERFORM A DIAGNOSTIC TEST TO DETERMINE THE CAUSE OF THE FAILURE. THE CONTACT REFUSED TO PAY FOR THE DIAGNOSTIC. THE VEHICLE HAD NOT BEEN REPAIRED. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**Components: ENGINE**

**NHTSA ID Number:** 11278702

**Incident Date** September 30, 2018

**Consumer Location** BUENA PARK, CA

**Vehicle Identification Number** JF1ZCAB13D1****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2013 SUBARU BRZ. WHILE THE |
| FIRE | No | CONTACT'S SON WAS DRIVING 65 MPH, THE VEHICLE LOST POWER AND THE CHECK ENGINE WARNING INDICATOR |
| INJURIES | 0 | ILLUMINATED. THE DRIVER HEARD AN ABNORMAL NOISE AND |
| DEATHS | 0 | THEN THE VEHICLE SEIZED. THE VEHICLE WAS TOWED TO THE DRIVER'S RESIDENCE. OCEAN SUBARU OF FULLERTON |

TL* THE CONTACT OWNS A 2013 SUBARU BRZ. WHILE THE CONTACT'S SON WAS DRIVING 65 MPH, THE VEHICLE LOST POWER AND THE CHECK ENGINE WARNING INDICATOR ILLUMINATED. THE DRIVER HEARD AN ABNORMAL NOISE AND THEN THE VEHICLE SEIZED. THE VEHICLE WAS TOWED TO THE DRIVER'S RESIDENCE. OCEAN SUBARU OF FULLERTON (LOCATED AT 1100 S EUCLID ST, FULLERTON, CA 92832, (888) 428-2419) WAS CALLED AND INFORMED OF THE FAILURE. THE VEHICLE WAS NOT DIAGNOSED. THE CONTACT STATED THAT AN INDEPENDENT MECHANIC CAME TO THE DRIVER'S RESIDENCE TO REPLACE THE ENGINE. THE VEHICLE WAS REPAIRED. THE VIN WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE AND ENGINE COOLING). THE MANUFACTURER WAS INFORMED OF THE FAILURE. THE FAILURE MILEAGE WAS 68,000.

**Components: ENGINE**

**NHTSA ID Number:** 11267119

**Incident Date** October 4, 2019

**Consumer Location** ARLINGTON, TX

**Vehicle Identification Number** JF1ZCAB16D2****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | IN APRIL 2019, I BROUGHT MY 2013 SUBARU BRZ TO THE |
| FIRE | No | SUBARU DEALERSHIP FOR VALVE SPRING RECALL. ABOUT 5 MONTHS LATER WHILE I'M DRIVING HOME FROM WORK, MY |
| INJURIES | 0 | CAR MAKING LOUD KNOCKING NOISE AND VIBRATE |
| DEATHS | 0 | AGGRESSIVELY. I'M VERY FORTUNATE THAT I MAKE IT HOME |

IN APRIL 2019, I BROUGHT MY 2013 SUBARU BRZ TO THE SUBARU DEALERSHIP FOR VALVE SPRING RECALL. ABOUT 5 MONTHS LATER WHILE I'M DRIVING HOME FROM WORK, MY CAR MAKING LOUD KNOCKING NOISE AND VIBRATE AGGRESSIVELY. I'M VERY FORTUNATE THAT I MAKE IT HOME SAFE. AFTER DOING SOME RESEARCH, I FOUND OUT I'M NOT THE ONLY ONE HAD ENGINE FAILURE AFTER VALVE SPRING RECALL DONE. I TOW MY CAR TO THE DEALERSHIP AND THEY SAID IT WILL COST $1800 TO TEAR MY ENGINE APART AND CHECK FOR PROBLEM. I CALLED SUBARU CORPORATE AND THEY SAID THIS IS WORKMANSHIP ISSUE AND I NEED TO DEAL WITH THE DEALERSHIP. NOW I'M STUCK WITH A DEAD CAR. MY CAR WAS PERFECTLY FUNCTION BEFORE THE RECALL DONE. PLEASE INVESTIGATE THIS ISSUE.

**September 13, 2019** NHTSA ID NUMBER: 11255369
**Components: ENGINE**



**NHTSA ID Number:** 11255369

**Incident Date** August 9, 2019

**Consumer Location** LINCOLN, NE

**Vehicle Identification Number** JF1ZNAA13D2****

**Summary of Complaint**

| | |
|---|---|
| CRASH | No |
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

TL* THE CONTACT OWNS A 2013 SCION FR-S. THE CONTACT STATED THAT THE VEHICLE WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 18V772000(ENGINE AND ENGINE COOLING). THE VEHICLE'S PREVIOUS OWNER TOOK THE VEHICLE TO BAXTER TOYOTA LINCOLN (8600 S 33RD ST, LINCOLN, NE 68516, 531-739-5213) WHERE THE RECALL REPAIR WAS SERVICED. AFTER APPROXIMATELY 2,000 MILES, WHILE ACCELERATING, THE CONTACT HEARD A LOUD KNOCKING NOISE COMING FROM THE ENGINE WITHOUT WARNING. THE CONTACT DROVE THE VEHICLE HOME. DUE TO THE KNOCKING NOISE, THE CONTACT HAD THE VEHICLE TOWED BACK TO THE SAME DEALER WHERE HE WAS GIVEN THE OPTION TO REPLACE A SMALL BLOCK OF THE ENGINE. THE VEHICLE WAS REPAIRED. THE CONTACT DID NOT DIRECTLY NOTIFY THE MANUFACTURER OF THE DEFECT; HOWEVER, A SERVICE MANAGER AT THE DEALER INFORMED HIM THAT THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 106,190.

**December 20, 2019** NHTSA ID NUMBER: 11290235
**Components: ENGINE**

**NHTSA ID Number:** 11290235

**Incident Date** December 16, 2019

**Consumer Location** CHEHALIS, WA

**Vehicle Identification Number** JF1ZNAA10D2****

**Summary of Complaint**

| | |
|---|---|
| CRASH | No |
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

AFTER TAKING CARE OF ENGINE VALVE SPRING RECALL. DROVE MY CAR FOR A WHILE EVERYTHING SEEMED NORMAL AND AT RANDOM MY CHECK ENGINE LIGHT CAME ON, WITH SUDDEN LOSS OF POWER TO VEHICLE. GOT IT RUNNING, AS IT SHOOK AND WAS MAKING A WEIRD KNOCKING I TOOK MY CAR TO DEALERSHIP IMMEDIATELY TO FIGURE OUT THIS PROBLEM AND THEY CLAIMED MY SCION FRS 2013 NEEDS A NEW MOTOR AT A COST OF $10,630.59 BECAUSE MY WARRANTY IS NOW EXPIRED AND I HAD NOTHING TO SHOW TO THEM THAT IT HAD ANYTHING TO DO WITH THE RECALL. WHEN THIS WAS THE ONLY THING THAT COULD CAUSE THIS TO HAPPEN.

## October 7, 2019 NHTSA ID NUMBER: 11266898
### Components: ENGINE



**NHTSA ID Number:** 11266898

**Incident Date** September 30, 2019

**Consumer Location** ONTARIO, CA

**Vehicle Identification Number** JF1ZNAA17D1****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2013 SCION FR-S. THE CONTACT STATED THAT THE VEHICLE WAS REPAIRED PER NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE AND ENGINE COOLING). AFTER THE REPAIR, WHILE DRIVING APPROXIMATELY 40 MPH, A CLINKING NOISE WAS HEARD AND THE VEHICLE SHOOK AND SHUT DOWN. ALSO, THE ENGINE OIL WARNING INDICATOR ILLUMINATED BRIEFLY AND THEN DIMMED. THE VEHICLE WAS TOWED BACK TO JOHN ELWAY'S CROWN TOYOTA (909-212-0546, LOCATED AT 1201 KETTERING DR, ONTARIO, CA 91761) WHERE THE RECALL WAS REPAIRED. THE TECHNICIAN STATED THAT THE ENGINE NEEDED TO BE TAKEN APART TO DIAGNOSE THE FAILURE. THE VEHICLE WAS TAKEN APART AND THE TECHNICIAN STATED THAT THE NUMBER TWO ROD BEARING WAS NOT FOUND AND THE NUMBER THREE ROD BEARING WAS WORN. THE TECHNICIAN STATED THAT THE FAILURES WERE NOT PART OF THE RECALL. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND AGREED WITH THE DEALER. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS APPROXIMATELY 56,678. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

## December 18, 2019 NHTSA ID NUMBER: 11289889
### Components: ENGINE



**NHTSA ID Number:** 11289889

**Incident Date** December 17, 2019

**Consumer Location** VICTORVILLE, CA

**Vehicle Identification Number** JF1ZNAA13D1****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | TL* THE CONTACT OWNS A 2013 SCION FR-S. THE CONTACT RECEIVED A RECALL NOTIFICATION FOR NHTSA CAMPAIGN NUMBER: 18V772000 (ENGINE AND ENGINE COOLING). THE VEHICLE WAS TAKEN TO VALLEY HI TOYOTA (14612 VALLEY CENTER DR, VICTORVILLE, CA 92395, (760) 241-6484) AND WAS REPAIRED PER THE RECALL. WHILE DRIVING 35 MPH, A KNOCKING NOISE WAS HEARD UNDERNEATH THE VEHICLE. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE NUMBER THREE PISTON FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 99,000. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

16.     The failure scenarios reported to NHTSA and experienced by Plaintiffs, as detailed below, are consistent. In addition, as Defendants are aware (because they monitor public message boards and automotive forums), numerous additional consumers have complained of remarkably similar failure scenarios of their Class Vehicle engines after having the Recall Work performed.

17.     Plaintiffs demand that Defendants accept responsibility for selling vehicles with defective valve springs and for the catastrophic engine failures resulting from the Defendants' attempts to correct the defect. But for Defendants' wrongful concealment of the defect for more than five (5) years after discovering it back in 2013, the valve spring replacement and all associated repairs, engine damages and diagnostic charges would have been covered under the terms of the five (5) year 60,000 mile new vehicle express warranties issued by the Defendants.

18.     Plaintiffs bring their claims individually and on behalf of all persons or entities in the United States and/or California, Florida, Illinois, New Jersey, North Carolina, Pennsylvania, Texas, Utah, Virginia and Washington who own(ed) or lease(d) a 2013 Subaru BRZ, 2013 Toyota Scion FR-S or 2013 Subaru XV Crosstrek subject to NHTSA Recall No. 18V-772 (the "Class Vehicles").

**Defendants' Relationship**

19.     Toyota Motor Corp., the parent of Toyota, owns a significant share of Subaru. In fact, Toyota Motor Corp. has increased its ownership to about 20% of Subaru in recent months. *See* https://www.reuters.com/article/us-toyota-subaru/toyota-strengthens-japan-partnerships-with-bigger-subaru-stake-idUSKBN1WC04E. Accordingly, Subaru and the Toyota Defendants have common ownership and a close working relationship.

20.     The Defendants jointly developed the Subaru BRZ and the Toyota Scion

FR-S.  Defendants have reported that Subaru was responsible for developing the engine used in all of the Class Vehicles.

**The Recall**

21.    On November 1, 2018, Subaru filed a "Defect Information Report" or "Safety Recall Report" ("Safety Report") with NHTSA concerning the valve spring defect in the Class Vehicles. *See* **Exhibit C**.

22.    The Safety Report was filed in accordance with the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101, *et seq*. ("Motor Vehicle Safety Act").  This initiated the "Recall" which was assigned the Recall number 18V-772 by NHTSA.

23.    Pursuant to the Motor Vehicle Safety Act, Subaru and Toyota were required to send Recall notice letters to owners and lessees of the Class Vehicles.  The Recall notice letters were mailed beginning in late December 2018.

24.    The Defendants have admitted in the Recall notice letters sent to Plaintiffs and the Class members that the valve springs in the engines of the Class Vehicles are defective and may fracture, causing the engine to malfunction, and "result in the engine stalling during driving and the inability to restart the vehicle."  *See* Subaru Notice Letter and Toyota Notice Letter, attached hereto as **Exhibits A and B**, respectively.

25.    Defendants concede that the defective valve springs can "increase the risk of a crash" as a result of the engines malfunctioning and stalling. *See id*.

26.    Amongst the information Defendants have provided to their agents and authorized dealers, is the following diagram of the valve springs and information about the defect:

The valve springs located inside the engine of the affected vehicles may fracture, which may cause an abnormal noise or engine malfunction. In the worst case, this may result in the engine stalling during driving and the inability to restart the vehicle. An engine stall while driving at higher speeds could increase the risk of a crash.



27.     Along with the Safety Report, Defendants also filed with NHTSA on November 1, 2018 a "Chronology of Defect/Noncompliance Determination" report. *See* **Exhibit D** ("Timeline Report").   In the Timeline Report, Subaru acknowledges that beginning in April 2012 Subaru began receiving field reports of valve spring failures in Class Vehicles. Therefore, as of May 2013, Subaru increased the diameter of the valve spring wire used in the engines from that time forward. *Id*.

28.     Upon information and belief, given the joint development and production of the Scion FR-S along with the Subaru BRZ and other Class Vehicles, and given the engineering and product analysis responsibilities of Defendant TEMA, and the shared ownership of Subaru and Toyota by Toyota's parent company, Plaintiffs allege that all of the Defendants were equally aware of the information contained in the Timeline Report and the field reports of valve spring failures and all Defendants participated and shared their knowledge of the internal investigations and analysis of the defects in the valve springs.

29.     Subaru reported in the Timeline Report that it also realized by August 2015

that impurities were in the valve spring material for vehicles manufactured through May 2013. *Id*.

30.     Defendants remained silent about these known defects for years while consumers continued to purchase and operate the Class Vehicles and Defendants received abnormally high reports of failures with the Class Vehicles. *See Id*.

31.     Defendants concede that the valve springs in the Class Vehicles were defective both in design and manufacture. *Id*. Specifically, "[t]he excessive stress [on the valve spring] combined with the dispersion of impurity within the composition of the spring material" leads to failure. *Id*.

32.     In the Safety Report filed by Subaru, Subaru represented that it was the manufacturer of all of the Class Vehicles. Ex. C.

33.     On or around December 19, 2018, Toyota submitted to NHTSA a "SAFETY RECALL J02 (Remedy Notice)" containing a list of "Frequently Asked Questions" about the Recall. *See* **Exhibit G**. In that submission, Toyota stated that "[t]he Scion FR-S was manufactured by Subaru under an agreement between Subaru and Toyota." *Id*., p.1 at A4.

34.     Toyota further explained in that NHTSA filing that "[t]he valve spring is an engine component that functions to close the exhaust and intake valves during the combustion cycle." *Id*., p.1 at A1a. And further explained that in the Class Vehicles, the valve springs "may fracture, which may cause an abnormal noise or engine malfunction … [and] may result in the engine stalling during driving and the inability to restart the vehicle." *Id*., p.1 at A1.

35.     Upon information and belief, Subaru was responsible initially for investigating the reports of failures with the valve springs beginning in or around April 2012 and shared such information with the Toyota Defendants.

15

36.     However, it was not until late December 2018 when Defendants began to instruct owners of the Class Vehicles to contact Subaru or Toyota dealers immediately in order to have the valve springs replaced (the "Recall Work"). *See* Ex. A (instructing Subaru owners to "immediately contact your Subaru retailer (dealer) for an appointment to have this important repair performed"), Ex. B (instructing Toyota owners to contact a dealer "to have the remedy performed as soon as possible") (collectively, the "Recall Notices").

37.     Defendants represented in the Recall Notices and other public announcements that pursuant to the Recall Work the defective condition and hazards posed by the Class Vehicles would be remedied and all valve springs would be replaced free of charge with "new ones of an improved design." *See* Ex. A and B.

38.     Plaintiffs and putative class members brought their Class Vehicles to Defendants' authorized agents for Recall Work in reasonable reliance upon Defendants' promises to repair their vehicles and eliminate the safety hazard.

39.     Unfortunately, and upon information and belief, the Recall Work is not remedying the hazard, but instead, is *increasing* the risk of valve spring and/or other engine malfunction, is causing catastrophic engine damage to the Class Vehicles and is *increasing* the risk of vehicle crashes caused by vehicles suddenly stalling while being driven.

40.     Engine failures after the Recall Work is performed are widespread and have been brought to the Defendants' attention by Plaintiffs as well as numerous Class members and the press.

41.     In absolute disregard to their loyal customers, and after wrongfully concealing and failing to disclose their knowledge of the valve spring defect for more than five years, Defendants are trying to force consumers to bear the costs and expenses associated with the engine failures resulting from the defective valve springs and the Recall

Work.

42. In addition to having their safety and that of the public put at risk, the owners of Class Vehicles are incurring substantial monetary losses because Defendants are refusing to accept liability under their new vehicle express warranties for the necessary valve spring repairs and related damages and likewise refuse to accept liability for the damages resulting from the Recall Work.

43. Defendants have long been on notice of the complaints raised by Plaintiffs. Plaintiffs and numerous putative class members have complained to Defendants, but Defendants have refused to accept liability, making further attempts at resolution futile and necessitating the filing of this class action.

44. Plaintiffs and Class members assert claims for breach of the Magnuson-Moss Warranty Act, breach of express warranties, breach of implied warranties, fraud, negligence, negligent misrepresentation, unjust enrichment and promissory estoppel.

45. As a direct result of Defendants' wrongful conduct, Plaintiff and Class members have been harmed and have suffered actual damages, including: repair and replacement costs, diagnostic charges, loss of use of their Class Vehicles, loss of the benefit of their bargain, diminished value of their vehicles, and costs and lost time associated with bringing in their Class Vehicles for diagnosis and repair.

## II. JURISDICTION AND VENUE

46. This Court has original diversity jurisdiction, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA") because multiple Plaintiffs and many members of the proposed Class and Classes are citizens of states different from Defendants' home states, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class and Classes.

47.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

48.     This Court has personal jurisdiction over Defendants because Subaru has its principal place of business and headquarters in this District; Toyota jointly developed the Scion FR-S with Subaru; Toyota and Subaru share common corporate ownership, with Toyota's parent company owning approximately 20% of Subaru.

49.     Further supporting personal jurisdiction is the fact that in jointly developing the Scion FR-S along with the Subaru BRZ, the Defendants necessarily conducted substantial business together in this District given that it is the principal place of business and headquarters of Subaru.  Further, upon information and belief, significant conduct at issue in this action involving Defendants jointly developing, selling, recalling, and investigating failures pre and post–Recall took place in this District.

50.     Given the common ownership of the Defendant companies and their joint efforts in developing, selling and recalling Class Vehicles, the Defendants' liability in this action arises from Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state which gives rise to matters at issue in the Complaint. All of these facts give this Court jurisdiction over all of the Defendants, as well as the fact that Defendants have an office or agency, including authorized dealers in this state, committed a tortious act in this state, and caused harm to persons and property in this state.

51.     Additional grounds for personal jurisdiction over Toyota is the fact that Plaintiff Blake is a New Jersey resident who purchased a 2013 Toyota Scion FR-S in New Jersey, had the Recall Work performed by an authorized Toyota dealership in New Jersey and suffered losses in New Jersey when Toyota refused to accept liability for Plaintiff Blake's destroyed engine.

52.      Venue is proper in this District, under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Defendants have caused harm to Class members residing in this District, Defendants regularly conduct business in this District, and because Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.

53.      Furthermore, Defendants have marketed, advertised, sold, and leased the Class Vehicles within this District and have issued Safety Recall Notices for the Class Vehicles to persons in this District (including Plaintiff Blake) and directed, supervised and/or performed Recall Work by way of its authorized dealers in this District.

**III.      PARTIES**

**Plaintiffs**

54.      Plaintiff Cristian Nunez is a citizen and resident of the state of Texas.  On or around October 11, 2017, Plaintiff purchased a 2013 Toyota Scion FR-S from Lone Star Toyota in Lewisville, Texas for personal, family, or household purposes.

55.      Plaintiff Richard Blake is a citizen and resident of the state of New Jersey. Prior to the Recall, Plaintiff purchased a 2013 Toyota Scion FR-S in New Jersey for personal, family, or household purposes.

56.      Plaintiff Christopher Jordan is a citizen and resident of the state of Virginia.  In April 2014, Plaintiff purchased a 2013 Toyota Scion FR-S in Virginia for personal, family, or household purposes.

57.      Plaintiff Patrick Fishel is a citizen and resident of the state of Washington.  Prior to the Recall, Plaintiff purchased a 2013 Toyota Scion FR-S for personal, family, or household purposes

58.     Plaintiff Hunter Trojnor-Hill is a citizen and resident of the state of North Carolina; he is an active-duty military member residing in Ft. Bragg.  In February 2019, without knowledge of the Recall, Plaintiff purchased a used 2013 Toyota Scion FR-S for personal, family, or household purposes.

59.     Plaintiff Yarik Tkal is a citizen and resident of the state of Florida.  On or around July 31, 2018, Plaintiff purchased a certified pre-owned 2013 Subaru BRZ from Port Richey Subaru in Port Richey, Florida for personal, family, or household purposes.

60.     Plaintiff Tucker Owen is a citizen and resident of the state of Utah.  On September 6, 2018, Plaintiff purchased a 2013 Toyota Scion FR-S for personal, family, or household purposes.

61.     Plaintiff Hugo Dominguez is a citizen and resident of the state of California.  In or around October 2016, Plaintiff purchased a used 2013 Toyota Scion FR-S for personal, family, or household purposes.

62.     Plaintiff Troy Shaffer is a citizen and resident of the state of Pennsylvania.  In February 2013, Plaintiff purchased a new 2013 Toyota Scion FR-S for personal, family, or household purposes.

63.     Plaintiff Michael Sanders is a citizen and resident of the state of Pennsylvania.  In November 2017, Plaintiff purchased a 2013 Subaru Crosstrek XV for personal, family or household purposes.

64.     Plaintiff Myers Herron is a citizen and resident of the state of Arizona.  On or around September 9, 2015, Plaintiff purchased a 2013 Toyota Scion FR-S for personal, family, or household purposes.

65.     Plaintiff Shunfu Hu is a citizen and resident of the state of Illinois. On June 25, 2018, Plaintiff purchased a certified pre-owned 2013 Subaru BRZ for personal, family,

or household purposes.

**Defendants**

66.     Defendant Subaru is a New Jersey corporation with its principal place of business and headquarters in Camden, New Jersey.

67.     Subaru is the automobile marketing, sales and distribution division of the Japanese conglomerate Subaru Corporation.

68.     Subaru has a nationwide dealership network and operates throughout the United States.

69.     Subaru marketed, distributed, and sold all of the Subaru Class Vehicles and was responsible for conducting and overseeing the Recall and Recall Work, including but not limited to disseminating technical information and mechanic training materials to its authorized Dealers, and monitoring the performance of Class Vehicles in the United States.

70.     Defendant TMS is a California corporation with its corporate headquarters located at 6565 Headquarters Drive, Plano, Texas 75024. TMS manages and supports a Dealer network located throughout the state of New Jersey and the United States.

71.     TMS is the authorized importer and distributor of Toyota motor vehicles in the United States. TMS was responsible for advertising, marketing, and selling the Class Vehicles as well as for conducting the Recall.

72.     At all relevant times, TMS acted through its authorized employees, agents, and its Distributor and Dealer networks in performing activities associated with advertising, marketing and selling the Toyota Class Vehicles, issuing the Safety Recall Notice and conducting and/or overseeing the Recall Work, including but not limited to disseminating technical information and mechanic training materials to its authorized Dealers, and monitoring the performance of Class Vehicles in the United States.

21

73.     Defendant TEMA is a Kentucky corporation with its corporate headquarters located at 6565 Headquarters Drive, Plano, Texas 75024.

74.     TEMA is the automobile engineering, manufacturing, research, and design group in North America for Toyota motor vehicles. TEMA designs, develops, tests, manufactures, assembles, and/or evaluates Toyota motor vehicles in the United States. TEMA also develops parts for North American Toyota vehicles. TEMA operates factories which manufacture Toyota vehicles and operates research and development facilities.

75.     Upon information and belief, based on the operations and functions it is responsible for, TEMA was involved in pre-production testing of the Class Vehicles and postproduction investigations into the defective valve springs and was aware of the defect in the valve springs no later than May 2013.

76.     Upon information and belief, Subaru, TMS and TEMA were all involved with investigating the valve spring defect in the Class Vehicles, and concealing disclosure of the defect from the public until November 1, 2018, at which time they were involved with issuing the Recall Notice and/or training, directing and/or instructing authorized agents to perform the Recall Work.

IV.     **FACTS**

**Plaintiff Nunez**

77.     Plaintiff Cristian Nunez purchased his Class Vehicle from Lone Star Toyota, which is a Toyota authorized Dealer.  Plaintiff continues to own the 2013 Toyota Scion. When Plaintiff purchased his Class Vehicle, he was unaware his Class Vehicle contained defective valve springs.

78.     In or around August 20, 2019, Plaintiff received the Recall Notice issued by Toyota, in substantially the form included in Exhibit B.

22

79.     As a result of the notice from Toyota, on or about August 26, 2019, Plaintiff took his car to Lone Star Toyota, a Toyota authorized dealer in Lewisville, Texas for the Recall Work.

80.     Approximately a week later, on or about September 1, 2019, Plaintiff was driving his car on a highway when he heard a loud knocking sound coming from the engine. The vehicle's engine then immediately shut down, stranding Plaintiff on the side of the road.

81.     Because this issue occurred on the Sunday of Labor Day weekend, Plaintiff was forced to wait until Tuesday, September 3, 2019, to have his vehicle towed to the service department at Lone Star Toyota.

82.     Upon presenting his car to the dealership, the engine of Plaintiff's vehicle was opened and inspected by service technicians at Lone Star Toyota.

83.     The technicians informed Plaintiff that they found metal shavings inside the engine, including in the engine oil, and that these metal shavings caused a bearing failure inside the engine. This is consistent with the engine failures reported by other Class members after having the Recall Work performed.

84.     Various service department employees, including a service advisor identified as Robert McMillan, speculated that Plaintiff "must have caused these issues when performing prior engine work himself." This was in spite of the fact that (1) Plaintiff informed the technicians that he did not, and had not, performed any work on his own vehicle; and (2) these metal shavings were not present when the same dealership performed the Recall Work on Plaintiff's car one week prior to these events.

85.     Plaintiff was informed by Lone Star Toyota that his vehicle needed an entirely new engine, and that the cost of the engine would be approximately six thousand

five hundred dollars ($6,500.00), which cost would be entirely borne by Plaintiff.

86.     Despite his initial decision to blame Plaintiff for the issues with his car, McMillan agreed to keep Plaintiff's vehicle at the dealership, issue Plaintiff a loaner vehicle, and inquire as to whether Toyota would cover some or all of the cost of the necessary engine replacement.

87.     After a considerable period of time had lapsed without any response from Toyota and/or the dealership, on or about September 11, 2019, Plaintiff was contacted by the dealership and informed that Toyota had refused to cover any of the cost of the repairs to Plaintiff's vehicle. Moreover, Plaintiff was informed that he was required to either (1) agree to a $1,500.00 charge to have a representative of Toyota travel to the dealership to inspect the vehicle firsthand; or (2) pay to have the vehicle towed from the dealership's premises, and immediately return the loaner vehicle that Plaintiff had been using to travel to work, and for other necessary personal travel. The dealership also required that Plaintiff pay for the use of the loaner vehicle during the time period in which his car was being evaluated by the dealership and Toyota.

88.     Plaintiff was and is not in a position to pay the amounts demanded by Toyota and has therefore been left without a working automobile.

89.     Plaintiff did not cause the engine failure in his vehicle and did not self-perform any maintenance work on his vehicle before or after the Recall Work was performed.

**Plaintiff Blake**

90.     Plaintiff Richard Blake purchased his Class Vehicle in New Jersey in early January 2017. Plaintiff continues to own the 2013 Toyota Scion FR-S. When Plaintiff purchased his Class Vehicle, he was unaware his Class Vehicle contained defective valve

springs.

91.     Plaintiff received the Recall Notice issued by Toyota, in substantially the form included in Exhibit B.

92.     As a result of the notice from Toyota, in or around February 2019, Plaintiff took his car to Liberty Toyota, a Toyota authorized dealer in Burlington, New Jersey for the Recall Work.

93.     At the time the Recall Work was performed, Plaintiff's Class Vehicle had been driven approximately 81,000 miles.  Within three months and 3,000 miles after the Recall Work was performed, Plaintiff noticed a loud knocking noise in his engine.

94.     Plaintiff took his vehicle back to Liberty Toyota and was advised that he needed to have his engine rebuilt.  The repair work took about one month to be completed and cost over $6,000.  Plaintiff charged approximately $4,000 to his credit card and took a loan of $2,500 in order to pay for the repairs.

### Plaintiff Jordan

95.     Plaintiff Christopher Jordan purchased his Class Vehicle in Virginia in 2014. At the time of purchase, the vehicle had about 16,000 miles.  Plaintiff continues to own the 2013 Toyota Scion FR-S but it is inoperable and remains on the property of the Toyota dealer that performed the Recall Work. When Plaintiff purchased his Class Vehicle, he was unaware his Class Vehicle contained defective valve springs.

96.     Plaintiff received the Recall Notice issued by Toyota, in substantially the form included in Exhibit B.

97.     As a result of the notice from Toyota, Plaintiff took his car to an authorized Toyota dealer in Virginia for the Recall Work on or about January 30, 2019.  At the time, the vehicle had approximately 60,000 miles.

98.     Immediately after the Recall Work was performed, the engine in Plaintiff's Class Vehicle began making a loud knocking noise when running and Plaintiff refused to take possession of the vehicle in that condition after test driving it at the dealership. Plaintiff repeatedly complained to the Toyota dealer about the damage resulting from the Recall Work but the dealer denied any responsibility.

99.     As a result, Plaintiff is unable to drive the car, which has remained at the dealership since January 2019, and has had to borrow a relative's 20-year-old vehicle and incur significant additional operational and maintenance expenses in doing so.

### Plaintiff Fishel

100.     Plaintiff Patrick Fishel purchased his Class Vehicle in Washington in the summer of 2017. Plaintiff continues to own the 2013 Toyota Scion FR-S. When Plaintiff purchased his Class Vehicle, he was unaware his Class Vehicle contained defective valve springs.

101.     Plaintiff received the Recall Notice issued by Toyota, in substantially the form included in Exhibit B

102.     As a result of the notice from Toyota, on January 14, 2019 Plaintiff took his car to McCord's Vancouver Toyota, a Toyota authorized dealer in Vancouver, Washington for the Recall Work

103.     Plaintiff's vehicle had been driven approximately 45,000 miles at the time he purchased it. When he brought the vehicle in for the Recall Work, it had been driven 64,959 miles. The mileage was documented on a tire inspection report prepared by the dealer at that time.

104.     The Recall Work was completed at the Toyota dealership from January 14-16, 2019. On January 17, 2019, Plaintiff picked up his vehicle from the dealer. On January

19, 2019, after having driven the vehicle for a total of 60 miles since the Recall Work was performed, the engine suddenly bogged down while on the roadway, the engine idled roughly, the check engine and traction control warnings came on, and then the engine suddenly failed completely.

105.      The vehicle was brought back to the same Toyota dealer that performed the Recall Work and a "specialist" inspected it.   The Toyota dealer denied that it did anything wrong and, without proof, claimed the failure must have been the result of engine abuse.

106.      Plaintiff contacted Toyota itself and it refused to assist and simply sided with the dealer.  The Toyota dealer then demanded prepayment for the cost of a replacement engine and its labor.

107.      Plaintiff incurred out of pocket losses of approximately $5,300 for a used replacement engine, additional components and installation labor.

### Plaintiff Trojner-Hill

108.      Plaintiff Hunter Trojnor-Hill is an active duty member of the military stationed at Ft. Bragg and purchased his Class Vehicle in North Carolina.   Plaintiff continues to own the 2013 Toyota Scion FR-S. When Plaintiff purchased his Class Vehicle, he was unaware of the Recall and unaware his Class Vehicle contained defective valve springs.  The vehicle had approximately 62,000 miles at the time of purchase.

109.      Plaintiff had an appointment with Rick Hendrick Toyota, an authorized Toyota dealer in Fayetteville, NC, regarding a suspension issue when he was advised of the Recall in March 2019. At the time, the car had approximately 63,000 miles.

110.      Within 7-10 days of having the Recall Work performed, the engine started knocking very loudly and failed.  Plaintiff paid to have the vehicle towed back to the dealer.

27

The dealer diagnosed a "spun bearing" and denied responsibility.

111.     Plaintiff sold his car at a loss of more than $3,000 without replacing the engine.  He was forced to purchase another vehicle and incurred additional substantial expenses in doing so.

### Plaintiff Tkal

112.     Plaintiff Yarik Tkal purchased his Class Vehicle in Florida.  Plaintiff continues to own the 2013 Subaru BRZ but it is inoperable. When Plaintiff purchased his Class Vehicle, he was unaware his Class Vehicle contained defective valve springs.

113.     Plaintiff purchased his BRZ as a Subaru-certified pre-owned vehicle from Subaru Port Richey, an authorized Subaru dealership in Port Richey, Florida, on July 31, 2018.  At the time of purchase, the vehicle had been driven approximately 80,000 miles.

114.     A few months after purchasing the vehicle, Plaintiff received the Recall Notice issued by Subaru, in substantially the form included in Exhibit A.  As a result of the notice from Subaru, on February 21, 2019, Plaintiff brought the vehicle to Sport Subaru-Mitsubishi, an authorized Subaru dealership, to have the Recall Work performed. At that time, the vehicle had been driven a total of approximately 89,000 miles.

115.     The Subaru dealer kept Plaintiff's vehicle from February 21, 2019 until March 4, 2019 to complete the Recall Work.

116.     Approximately 6 months after having the Recall Work performed, Plaintiff's vehicle lost power while driving and he was unable to accelerate.  On October 11, 2019, Plaintiff returned the vehicle to the Subaru dealer that performed the Recall Work.  The vehicle had approximately 98,000 miles at that time.

117.     The dealer advised Plaintiff that it was in direct contact with Subaru about the problem and denied knowledge of any problems associated with the Recall Work.

118.    After keeping the vehicle for approximately 2 months, and charging Plaintiff $266 for a diagnostic, the Subaru dealer quoted Plaintiff a price of over $9,100 for a used, replacement engine that would not come with a warranty.

119.    Plaintiff refused to pay for the replacement engine and now owns an inoperable vehicle.

### Plaintiff Owen

120.    Plaintiff Tucker Owen purchased his Class Vehicle in Utah on September 6, 2018.  Plaintiff continues to own the 2013 Scion FR-S. When Plaintiff purchased his Class Vehicle, he was unaware hisClass Vehicle contained defective valve springs.

121.    As a result of the "Recall Notice" issued by Toyota, Plaintiff brought his car to an authorized Toyota dealership in Utah in February 2019 for the Recall Work.  The dealer had the car from February 8-13, 2019.  At the time the Recall Work was performed, the vehicle had approximately 106,000 miles.

122.    Approximately five (5) weeks after the Recall Work was performed, and after driving just hundreds of miles since the Recall Work, Plaintiff was driving on a highway in the canyons of Utah when the engine started making a knocking noise and stopped performing.  Plaintiff was forced to coast down a sloped road and was stranded for hours.

123.    Plaintiff had the car towed to the same Toyota dealer that performed the Recall Work, Tony Divino Toyota in Riverdale, Utah, and was told there was a piston failure.  The dealer denied that it or Toyota was responsible for the damage.

124.    Plaintiff was forced to borrow money to pay for a replacement engine.  He paid approximately $6,000 to the Toyota dealer for the repairs.

**Plaintiff Dominguez**

125.    Plaintiff Hugo Dominguez purchased his Class Vehicle in California in or around October 2016.

126.    When Plaintiff purchased the 2013 Scion FR-S, he was unaware his Class Vehicle contained defective valve springs.

127.    Plaintiff received the Recall Notice from Toyota in substantially the form included in Exhibit B sometime around the end of December 2018 and brought the vehicle to John Elway's Crown Toyota.  The Recall Work was completed on or about February 8, 2019.  At the time, the vehicle had approximately 56,500 miles.

128.    Several weeks later, in April 2019, after driving only about 500 miles since the Recall Work, the engine started to knock loudly and then suddenly shut off while Plaintiff was driving to work.

129.    Plaintiff had the car towed back to the dealer that performed the Recall Work.  Plaintiff also contacted Toyota directly.  Toyota and the dealer both denied that the engine failure was related to the Recall Work.

130.    Plaintiff had the vehicle towed back to his home.  He is unable to afford repairs or to purchase another car.  Among other losses, the lack of a vehicle led to Plaintiff losing his job.

**Plaintiff Shaffer**

131.    Plaintiff Troy Shaffer purchased his new Class Vehicle in February 2013 from Toyota of Scranton in Scranton, Pennsylvania. When Plaintiff purchased his 2013 Toyota Scion FR-Class Vehicle, he was unaware his Class Vehicle contained defective valve springs.

132.    Plaintiff received the Recall Notice issued by Toyota, in substantially the

form included in Exhibit B. As a result of the notice from Toyota, on January 21, 2019, Plaintiff brought his car to Thompson Toyota, an authorized Toyota dealership in Doylestown, Pennsylvania.

133. Within four (4) months of the Recall Work, Plaintiff's vehicle suffered a complete engine failure. Plaintiff had the car towed to Thompson Toyota and was told on May 21, 2019 that there were shards of metal in the engine and that it was not repairable and not covered under warranty. At the time, the car had been driven approximately 90,000 miles.

134. Thompson Toyota quoted Plaintiff a price of $5000-$6,000 for a replacement engine which Plaintiff declined. Plaintiff was forced to sell the vehicle at auction for $3,000 and incurred a loss of approximately $9,000 in doing so based on the market value of the car if the engine had not failed. Plaintiff also incurred additional out of pocket losses for towing and auction fees.

### Plaintiff Sanders

135. Plaintiff Michael Sanders purchased his Class Vehicle on November 24, 2017 in Pennsylvania. At that time, the vehicle had approximately 78,500 miles. Plaintiff continues to own the 2013 Subaru Crosstrek XV, but it is inoperable.

136. When Plaintiff purchased his Class Vehicle, he was unaware his Class Vehicle contained defective valve springs.

137. Plaintiff received the Recall Notice in substantially the form included in Exhibit A in late March 2019 and had the Recall Work performed at Budd Baer Subaru, an authorized Subaru dealer in Washington, PA, from June 3, 2019 to June 6, 2019. At that time, the vehicle had approximately 114,000 miles.

138. Within six (6) months of the Recall Work, the engine stalled and the vehicle

lost all power while Plaintiff was driving. The vehicle would not restart. Plaintiff had the vehicle towed to the Subaru dealer that performed the Recall Work.

139.     After three weeks, the Subaru dealer told Plaintiff that "something went through the engine" and that the cylinder head, engine block and pistons were damaged and that a new engine assembly was needed. The dealer charged Plaintiff $687.87 for the diagnostic and quoted him $5252.45 for a new engine assembly because it was not covered under warranty.

140.     Plaintiff was and is not in a position to pay the amounts demanded by Subaru for a replacement engine and has therefore been left with a non-operable automobile.

**Plaintiff Herron**

141.     Plaintiff Myers Herron purchased his Class Vehicle in Arizona. Plaintiff continues to own the 2013 Toyota Scion FR-S, but it is inoperable. When Plaintiff purchased his Class Vehicle, he was unaware his Class Vehicle contained defective valve springs.

142.     Plaintiff received a phone call from Camelback Toyota, an authorized Toyota dealership in Phoenix, Arizona, in late 2018 to advise him about the mandatory safety recall for his Class Vehicle. As a result, Plaintiff brought his car to that dealership for the Recall Work on January 21, 2019.

143.     Plaintiff was without use of his car for one week while the Recall Work was performed. When he picked up his car from the Toyota dealer, he was told the car was fixed.

144.     On October 17, 2019, while driving his car to work, the car suddenly stalled and turned off. The car was brought to the same Toyota dealer that performed the Recall

Work and Plaintiff was charged $166.34 for a diagnostic. At the time of the engine failure, the vehicle had approximately 74,000 miles.

145.     On October 21, 2019, the dealer said the engine/short block failed and advised that Toyota would not cover the cost of repairs. The dealer advised Plaintiff to buy another car or replace the engine.

146.     Plaintiff incurred in excess of $10,000 in out of pocket losses for a replacement engine. He also paid for Uber rides to go to and from the dealership.

### Plaintiff Hu

147.     Plaintiff Shunfu Hu resides in Illinois and purchased his Class Vehicle on June 25, 2018. Plaintiff continues to own the 2013 Subaru BRZ, but it is inoperable. When Plaintiff purchased his Class Vehicle, he was unaware his Class Vehicle contained defective valve springs.

148.     At the time of purchase, the mileage on Plaintiff's BRZ was slightly under 52,000 miles.

149.     Plaintiff received the Recall Notice in substantially the form included in Exhibit A mailed from Subaru sometime in late 2018 and he called a Subaru dealership shortly thereafter. Plaintiff was told by Lou Fusz Subaru in St. Louis that the dealership could not perform the Recall Work for at least a few months because it needed to send a technician to be trained by Subaru to perform the Recall Work.

150.     Plaintiff had the Recall Work performed during the week of May 6, 2019 at the Subaru dealer. While driving the car home from the dealership on May 11, 2019, Plaintiff's engine was repeatedly stalling on the roadway. Plaintiff called Lou Fusz Subaru that same day to advise of the problem and left a message.

151.     On May 13, 2019, Plaintiff had his car towed back to the dealer. Lou Fusz

Subaru kept the car for another week but did not repair it.

152.      Plaintiff complained directly to Subaru about the situation, but it refused to cover the needed repairs.

153.      Plaintiff had the car brought back to the Subaru dealership again in August 2019, but it still refused to cover the repairs.

154.      Plaintiff is now left with an inoperable Class Vehicle and was forced to purchase another vehicle for his family's use at substantial expense.

**Additional Facts Common to Plaintiffs and the Classes**

155.      When Plaintiffs and Class members purchased or leased their Class Vehicles, they relied on the reasonable expectation—based on Defendants' representations and lack of disclosure to the contrary—that the Class Vehicles would be safe and reliable, equipped with engines and valve springs that were free from defects, and that Defendants stood by the quality of their vehicles and their warranties.

156.      Defendants have always emphasized the safety, quality and reliability of their vehicles, knowing that consumers, including Plaintiffs and Class members, rely upon such representations when purchasing or leasing vehicles.

157.      Toyota represented when selling the Class Vehicles and at all times relevant hereto has continued to represent to the public:

> **Of course, quality and reliability are just as important as a stylish ride. After all, if the ride doesn't go, what's the point? Which is the point of Scion's excellent warranty coverage. We stand behind the quality of our vehicles.**
>
> Ex. F, p.1.

158.      Similarly, Subaru represented when selling the Class Vehicles and at all

times relevant hereto as continued to represent to the public:

> **Your SUBARU has been designed and produced to give long service with a minimum of attention. A generous warranty, plus a nationwide network of dealers with service facilities, are provided to SUBARU owners to protect their investment in their SUBARU products.**
>
> ECF No. 38-6 at p. 2.

159.    At no time prior to their purchase or lease of their Class Vehicles, or even prior to the Recall, were Plaintiffs or Class members notified by Defendants that their Class Vehicles contained defective valve springs and posed a significant risk to their safety. Indeed, Defendants concealed this important information and intentionally did not disclose it to the public.

160.    The Class Vehicles delivered by Defendants were not those for which Plaintiffs and Class members bargained. Rather, the Class Vehicles suffered from a common defect—the defective valve springs. Had Defendants advised Plaintiffs and the public that the Class Vehicles contained defective valve springs and posed a significant risk to their safety back when Defendants learned of this information, Plaintiffs and Class members would have either (1) paid substantially less for the vehicles; (2) required an immediate remedy that restored the vehicles to the conditions bargained for; or (3) not purchased or leased the Class Vehicles.

161.    Plaintiffs and Class members paid premiums to purchase the Class Vehicles as a result of the brand, reliability, value, and safety representations made by Defendants and based on that fact that Defendants had not disclosed the fact that the vehicles were defective and posed a significant safety risk.

162.    A car purchased or leased with the reasonable expectation that it is safe and

35

reliable as advertised is worth more than a car known to be defective and subject to a safety recall for a substantial engine defect.

163.    Class members were harmed from the day they took delivery of their Class Vehicles because they did not get what they paid for—a car that was merchantable, reliable and safe to operate.

164.    As a direct result of Defendant's misrepresentations and omissions, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.  Plaintiffs and Class members paid a premium for the Class Vehicles that were advertised as safe and reliable, and received Class Vehicles that contained a defect known to Defendants but concealed from the public.

165.    Defendants also were unjustly enriched because they obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the cars they received in return.  Defendants have further been unjustly enriched by receiving payments from many Plaintiffs and Class members for diagnostics and engine replacements after suffering catastrophic engine failures following the Recall Work.

166.    When Plaintiffs and Class members received the Safety Recall Notices from Defendants and brought their vehicles in for the Recall Work they reasonably relied upon Defendants' representations and expected that the work would be performed in a good and workmanlike manner, that the replacement parts would be merchantable, that the replacement valve springs would be of an "improved design," that the Recall Work would correct the defective condition and eliminate the risk of the valve springs failing and causing the engine to malfunction and/or causing the engine to stall and increase the risk of a crash, and that the Recall Work would not increase the likelihood of engine failure and the safety

risks associated with engine stalling and failure, including the risk of engine fires.

167.     Plaintiffs and Class members operated their Class Vehicles in a reasonably foreseeable manner and as the Class Vehicles were intended to be used.

168.     Plaintiffs and the Class members have suffered ascertainable losses as a result of Defendants' wrongful conduct in selling and distributing defective Class Vehicles, failing to disclose information about the defect in a timely and proper manner, and failing to ensure that the Recall Work was properly performed.

169.     Prior to the Recall, neither Defendants nor any of their authorized agents informed Plaintiffs and Class members of the safety defect in the Class Vehicles; and after the Recall, neither Defendants nor any of their authorized agents informed Plaintiffs and Class members of the insufficient and improper recall remedy or the increased safety hazard and risk of loss associated with the Recall Work.

170.     At all relevant times, Defendants acted through their authorized agents and representatives in their dealer networks while performing activities associated with advertising, marketing, selling Class Vehicles and providing the Safety Recall Notices and associated repair work, warranties, warranty repairs, and dissemination of technical information and mechanic training materials associated with the Recall Work.

171.     At all times relevant to this action, Defendants manufactured, distributed, sold, leased, recalled and/or warranted the Class Vehicles under the Toyota and Subaru brand names throughout the United States.

172.     Upon information and belief, the Defendants jointly developed the recall remedy and disseminated or directed the dissemination of the Safety Recall Notices to Plaintiff and the Class members.

173.     Upon information and belief, the Defendants jointly devised the Recall

Work to be performed and created and disseminated the Recall Work instructions, directions, technical information and materials and supplied the replacement valve springs to their employees, agents and authorized dealers who served as their agents for the Recall Work.

174.     Defendants represent in the Safety Recall Notices that repairs will take up to one and one-half business days to complete.  *See* Exs. A and B.    Plaintiff and Class members have a significant loss of use of their Class Vehicles while the Recall Work is or was being performed as well as loss of use of their Class Vehicles when they failed as a result of the Recall Work and/or other defects common to the Class Vehicles.

## V.        CLASS ALLEGATIONS

175.     Plaintiffs bring this action, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and/or (b)(3), on behalf of the following Classes for the maximum time period allowable by law:

> **Nationwide Class:** All persons or entities who purchased or leased a Class Vehicle in the United States and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

> **Arizona Class:** All persons or entities who reside in Arizona and/or who purchased or leased a Class Vehicle in Arizona and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

> **California Class:** All persons or entities who reside in California and/or who purchased or leased a Class Vehicle in California and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**Florida Class:** All persons or entities who reside in Florida and/or who purchased or leased a Class Vehicle in Florida and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**Illinois Class:** All persons or entities who reside in Illinois and/or who purchased or leased a Class Vehicle in Illinois and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**New Jersey Class:** All persons or entities who reside in New Jersey and/or who purchased or leased a Class Vehicle in New Jersey and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**North Carolina Class:** All persons or entities who reside in North Carolina and/or who purchased or leased a Class Vehicle in North Carolina and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**Pennsylvania Class:** All persons or entities who reside in Pennsylvania and/or who purchased or leased a Class Vehicle in Pennsylvania and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**Texas Class:** All persons or entities who reside in Texas and/or who purchased or leased a Class Vehicle in Texas and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**Utah Class:** All persons or entities who reside in Utah and/or who purchased or leased a Class Vehicle in Utah and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**Virginia Class:** All persons or entities who reside in Virginia and/or who purchased or leased a Class Vehicle in Virginia and (i)

had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

**Washington Class:** All persons or entities who reside in Washington and/or who purchased or leased a Class Vehicle in Washington and (i) had the Recall Work performed and suffered engine failure afterwards or (ii) who own or lease a Class Vehicle and had the Recall Work performed or still need to have the Recall Work performed.

The Nationwide Class and the State Classes are referred to collectively as the "Classes."

176.     Plaintiffs reserve the right to revise the definition of the Classes based upon subsequently discovered information and reserve the right to establish sub-classes where appropriate.

177.     The Classes exclude Defendants and any entity in which Defendants have a controlling interest, as well as their officers, directors, legal representatives, successors, and assigns. The Classes also exclude government entities and judicial officers that have any role in adjudicating this matter.

178.     The Classes are each so numerous that joinder of all members is impracticable.

179.     Plaintiffs believe that there are in excess of 100 Class members in each State and thousands of members of the Nationwide Class throughout the United States.

180.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

181.     Plaintiffs' claims are typical of the claims of the Classes Plaintiffs seek to represent.

182.     As alleged herein, Plaintiffs and Class members sustained damages arising

out of the same actions and conduct of Defendants.

183.     Common questions of law and fact exist to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

- o   When Defendants discovered the defect in the Class Vehicles;

- o   Whether prior to the Recall, Defendants concealed or fraudulently omitted material information regarding the defect in the Class Vehicles;

- o   Whether Defendants made and breached express warranties in selling the Class Vehicles and/or in connection with the Recall Work;

- o   Whether Defendants made and breached implied warranties in selling the Class Vehicles and/or in connection with the Recall Work;

- o   Whether Defendants were negligent in providing their authorized dealers the instructions and facts necessary for properly performing the Recall Work;

- o   Whether Defendants negligently misrepresented to the Classes remedies and benefits to be provided by the Recall Work;

- o   Whether Plaintiff and the members of the Classes relied to their detriment upon the Defendants' promises;

- o   Whether Defendants should accept responsibility for engine failures and damages arising as a result of the Recall Work;

- o   Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

184.     Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all the obligations and material duties necessary. Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have no interests adverse to or in conflict with the interests of any of the other members of the Classes.

185.     Plaintiffs' interests are co-extensive with and not antagonistic to those of absent members within the Classes. Plaintiffs will undertake to represent and protect the

interests of absent members within the Classes and will vigorously prosecute this action.

186.     Plaintiffs have engaged the services of the undersigned counsel. Counsel are experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

187.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

188.     The Classes may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

189.     The interest of members within the Classes in individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

190.     The nature of notice to the Classes, upon certification of the Classes, is by best notice practicable under the circumstances including, amongst other things, direct mail, email, and/or publication via the internet.

## VI.     TOLLING OF THE STATUE OF LIMITATIONS AND ESTOPPEL

### Discovery Rule Tolling

191.     Plaintiffs and Class members had no way of knowing about Defendants' defective valve springs in their Class Vehicles when they purchased or leased the vehicles. As evidenced by Defendants' concealment and refusal to disclose the defect for more than five (5) years from when Defendants were aware of the defect, Defendants were intent on

42

hiding the defect and their unscrupulous behavior from regulators and consumers. This is the quintessential case for tolling.

192. Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Defendants were concealing the defect with the valve springs complained of herein and that Defendants were misrepresenting the safety, workmanship and quality of the Class Vehicles.

193. Within the period of any applicable statutes of limitation, or the period in which the express written warranties were in effect, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the defective valve springs and the true quality and workmanship of the Class Vehicles.

194. For these reasons, all applicable statutes of limitation and warranty time periods and mileage limitations have been tolled by operation of the discovery rule and because it would be unconscionable to apply such limitations and deadlines with respect to the claims of Plaintiffs and the Classes.

### Estoppel

195. Defendants were under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Class Vehicles and the defective valve springs in the Class Vehicles.

196. Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Class Vehicles and the defective valve springs in the Class Vehicles.

197. Based on the foregoing, it is unfair and unjust for Defendants to shift to

Plaintiffs and the Classes the expenses and losses that Defendants rightfully should bear under warranty or otherwise; thus, Defendants should be estopped from asserting any statutes of limitations, the express warranty time and mileage limitations, or any other time or mileage based grounds for denying Plaintiffs' claims.

### VII.    CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, et seq.)
### (On behalf of the Nationwide Class, or alternatively, all State Classes)

198.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

199.    This claim is brought against Defendants Subaru and TMS on behalf of Plaintiffs and the Nationwide Class, or alternatively, all State Classes.

200.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

201.    Subaru and TMS are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

202.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

203.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

204.    Subaru and TMS provided new vehicle warranties and representations as to the quality of the Class Vehicles when they sold the Class Vehicles. These warranties and representations are written warranties within the meaning of the Magnuson-Moss Warranty

Act, 15 U.S.C. § 2301(6)(A), (B).

205. The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

206. Subaru and TMS breached these express and implied warranties, as described in more detail in the Statement of Case and Facts in this Complaint.

207. The Class Vehicles are equipped with defective valve springs. The defective valve springs are failing and put vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect both as to impurities in the valve springs, their wrong sizing and their inability to withstand ordinary and expected stresses.

208. The valve springs are manufactured with defective materials and/or with poor workmanship. Defendants have known of these defects since at least May 2013, or even earlier.

209. Contrary to Defendants' representations about their vehicles, the valve springs and engines are defective in manufacture, materials and/or workmanship and are unsafe. Indeed, Defendants admit in the Safety Recall Notices that the Class Vehicles contain defective valve springs and pose a threat to the safety of the operators of the Class Vehicles.

210. The Class Vehicles share a common defect that causes or allows the engines to fail under circumstances in which non-defective engines would not.

211. The valve spring defect existed during the five (5) year, 60,000 mile, express warranty period and applicable implied warranty periods but was concealed and/or not disclosed by Defendants until November 1, 2018.

212. Defendants concealed and refused to disclose their knowledge of the valve spring defect so that they could wrongfully avoid liability under their warranties. As such, any limitations period or mileage terms of the express or implied warranties should be tolled from no later than May 2013 and otherwise not enforced against Plaintiffs and the Classes.

45

213.     Defendants Subaru and TMS further breached their written warranties by not repairing and replacing the valve springs within the time period and terms of the express warranties provided when the Class Vehicles were sold, and by not performing additional engine repairs necessitated by the defective valve springs or the replacement of the valve springs pursuant to the new vehicle written warranties issued by Defendants.

214.     Plaintiffs and the members of the Classes have had sufficient dealings with either Defendants or their agents (e.g., dealerships and technical support) to establish privity between Defendants on one hand, and Plaintiffs and each of the Class members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and its dealers, and specifically, of Defendants' express and implied warranties.  The Defendants' dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

215.     Defendants' written warranties are automatically transferrable from new car purchasers to subsequent purchasers.

216.     Affording Defendants a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here. Indeed, Defendants have long been on notice of the claims of Plaintiffs and Class members and have refused to provide a remedy or honor their warranty obligations.

217.     At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or were reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' defective valve springs and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defect prior to the Recall.

Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

218.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

219.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Indeed, there are thousands of Class members and damages in the aggregate of millions of dollars.

220.     Plaintiffs, individually and on behalf of all members of the Classes, seek all damages permitted by law, in an amount to be proven at trial.

## COUNT TWO
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On behalf of the Nationwide Class, or alternatively, all State Classes)

221.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

222.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class, or alternatively, all State Classes against the Defendants Subaru and TMS.

223.     Plaintiffs bring this count against these Defendants for separate actionable bases: 1) for selling the Class Vehicles in an unreasonably defective, unsafe condition, and un-merchantable condition, and 2) for the faulty repairs conducted by the Defendants'

authorized agents in connection with the Recall Work.

224. Plaintiffs and members of the Classes purchased or leased the Class Vehicles from Defendants, by and through Defendant's authorized agents for retail sales, or were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party.

225. At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

226. Defendants are and were at all relevant times a merchant and seller of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law. With respect to leases, Defendant is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

227. The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law. Defendants impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable transportation. The Class Vehicles contain an inherent defect in the valve springs and present an undisclosed safety hazard to drivers, occupants and the public. Thus, Defendants breached the implied warranty of merchantability with respect to the Class Vehicles.

228. Defendants received notice of the defective valve springs by numerous failures and internal investigations prior to May 2013, as well as from field reports and continuing investigations that continued after May 2013. Defendants received further notice

48

from consumer complaints made to dealers and distributors and/or other public complaints and through its additional testing and investigations. Affording Defendants a further opportunity to cure its breach of implied warranties would be unnecessary and futile here because Defendants knew of and concealed the defect and have refused to repair or replace the defective valve springs and the related engine failures associated with replacement of the defective valve springs, at no cost to Plaintiffs and the Classes.

229.     Any attempt by Defendants to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable. A gross disparity in bargaining power and knowledge existed between Defendant and members of the Classes. Defendant knew or should have known that the Class Vehicles and valve springs were defective and posed a serious safety risk prior to or shortly after the manufacture and sale of the Class Vehicles.

230.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and all members of the Classes have been damaged in an amount to be proven at trial.

231.     In addition, after Defendants conceded in November 2018 that the Class Vehicles had defective valve springs, Plaintiffs and members of the Classes had the Recall Work performed by Defendants' employees and/or authorized agents. At all relevant times, the Defendants were the manufacturers, distributors, warrantors, and/or sellers of the replacement parts installed as part of the Recall Work.

232.     The Defendants are and were at all relevant times a merchant and seller of motor vehicles and parts within the meaning of the Uniform Commercial Code.

233.     Defendants impliedly warranted that the replacement parts installed as part of the Recall Work were in merchantable condition and fit for the ordinary purpose for

which the components and the Class Vehicles are used.

234. The replacement parts installed as part of the Recall Work were not in merchantable condition and were and are not fit for the ordinary purpose of providing safe and reliable operation of the Class Vehicles.

235. The Defendants received notice of the defective replacement parts installed as part of the Recall Work by numerous consumer complaints made to dealers and distributors, and/or other public complaints and through its own testing and investigations. Affording the Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because the Defendants knew of and concealed the defective Recall Work, and, upon information and belief, refused to repair or replace the defects and resulting damage within a reasonable time.

236. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

237. Any attempt by Defendants to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable. A gross disparity in bargaining power and knowledge existed between Defendants and members of the Classes. Defendants knew or should have known that the replacement parts installed during the Recall Work were defective and posed a serious safety hazard.

**COUNT THREE**
**BREACH OF IMPLIED WARRANTY**
**OF GOOD AND WORKMANLIKE SERVICE**
**(On behalf of the Nationwide Class, or alternatively, all State Classes)**

238. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

239.     Plaintiffs bring this count on behalf of themselves and the State Classes and/or the National Class against the Defendants Subaru and TMS.

240.     Plaintiffs and members of the Classes had the Recall Work performed by Defendants' employees and/or authorized agents. At all relevant times, the Defendants and their authorized agents were the warrantors and sellers of the services performed as part of the Recall Work within the meaning of the Uniform Commercial Code.

241.     Defendants impliedly warranted that the Recall Work would be performed in a good and workmanlike manner and would safely and properly remedy the valve spring defect and associated safety hazards.

242.     The Recall Work was not performed in a good and workmanlike manner and is resulting in increased risk of loss and harm.

243.     The Defendants received notice of the defective Recall Work by numerous consumer complaints made to dealers and distributors, and/or other public complaints and through its own testing and investigations. Affording the Defendants a reasonable opportunity to cure their breach of implied warranties would be unnecessary and futile here because the Defendants knew of and concealed the defective Recall Work, and, upon information and belief, refused to repair or replace the defects and resulting damage within a reasonable time.

244.     As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

245.     Any attempt by Defendants to disclaim or limit the implied warranty of good and workmanlike service vis-à-vis consumers is unconscionable and unenforceable. A gross disparity in bargaining power and knowledge existed between Defendants and members of

the Classes. Defendants knew or should have known that the Recall Work was not good, safe and proper and that it created an increased risk of loss and harm.

**COUNT FOUR**
**BREACH OF EXPRESS WARRANTY**
**(On behalf of the Nationwide Class, or alternatively, all State Classes)**

246.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

247.     Plaintiffs bring this count on behalf of themselves and the National Class and/or the State Classes against the Defendants Subaru and TMS.

248.     Subaru and TMS were at all relevant times merchants and sellers of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

249.     With respect to leases, Subaru and TMS are and were at all relevant times lessors of motor vehicles within the meaning of the Uniform Commercial Code and relevant state law.

250.     The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code and relevant state law.

251.     In connection with the purchase or lease of each one of its new vehicles, Subaru and TMS provide an express new vehicle warranty for a period of five (5) years or 60,000 miles, whichever occurs first covering, *inter alia*, the powertrain, engine and all internal parts of the engine.

252.     The express warranty is uniform and made to all consumers across the country who purchase or lease the Class Vehicles. Further, the express warranties are transferrable automatically to subsequent purchasers of the Class Vehicles.

253.     The express warranty formed the basis of the bargain that was reached when Plaintiffs and other members of the Classes purchased or leased their Class Vehicles

equipped with the defective valve springs.

254.     The Class Vehicles were defective from the point of sale and Plaintiffs and the Class members owned the Class Vehicles suffering from the defects within the warranty period. Despite the existence of the warranty, Subaru and TMS concealed and failed to inform, and/or denied to, Plaintiffs and Class members that the Class Vehicles have defective materials and/or workmanship, and have failed to fix, repair or replace the defective valve springs and all associated engine damages and other damages pursuant to the terms of the warranty and at no charge to the Plaintiffs and the Classes.

255.     Subaru and TMS breached the warranties promising to repair and correct a manufacturing defect or defective materials or workmanship in the powertrain or engine, which specifically includes the valve springs in the engine.

256.     Subaru and TMS were provided notice of the defect in the Class Vehicles' valve springs by numerous failures and internal investigations prior to May 2013, as well as from field reports and continuing investigations that continued after May 2013. Defendants received further notice from consumer complaints made to dealers and distributors and/or other public complaints and through its additional testing and investigations.

257.     Defendants received further notice of the damages and losses caused by the faulty repairs of valve springs from Plaintiffs and/or by numerous consumer complaints made to their authorized dealers nationwide, complaints to NHTSA, and through Defendants' own testing. In addition, Defendants were specifically put on notice of a breach of express warranty claim by way of the initial complaint filed in the instant action but still refuse to provide remedial relief. Accordingly, affording Defendants a further reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because Defendants have known of and concealed and denied the existence of the

53

defect in the valve springs and the repairs to the valve springs and have failed to provide a suitable repair or replacement of the defective valve springs and associated engine damages and other damages free of charge within a reasonable time.

258.     Affording Subaru and TMS any additional opportunity to cure their breach of written warranties would be unnecessary and futile.

259.     Furthermore, the warranty promising to repair and/or correct a manufacturing or workmanship defect fails in its essential purpose because the remedy is insufficient to make Plaintiffs and Class members whole and because Defendants have failed and/or has refused to adequately provide the promised remedies within a reasonable time.

260.     Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing or workmanship defect, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

261.     Also, as alleged in more detail herein, at the time Subaru and TMS warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to their warranties and were inherently defective, and Defendants wrongfully concealed material facts regarding the defect in their Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

262.     Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to Defendants' conduct as alleged herein. Due to Defendants' failure and/or continued failure to provide such limited

remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would make the remedies insufficient to make Plaintiffs and the other Class members whole.

263.	Defendants were provided notice of these issues by numerous complaints voiced by consumers, including those formal complaints submitted to NHTSA and the initial Complaint in this case, within a reasonable amount of time after the defect was discovered.

264.	Because of Defendants' breach of express warranties as set forth herein, Plaintiffs and members of the Classes assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiffs and members of the Classes of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

265.	As a direct and proximate result Defendants' breach of express warranties, Plaintiffs and all members of the Classes have been damaged in an amount to be determined at trial.

266.	In addition, and as additional grounds for relief, Defendants sent the Safety Recall Notices to Plaintiffs and the Classes.

267.	In the Safety Recall Notices, the Defendants expressly warranted and guaranteed that the defective valve springs would be replaced free of charge with new ones of an improved design and that the Recall Work will remedy the defective valve springs and any associated safety risk.

268.	Plaintiffs and members of the Classes had the Recall Work performed by Defendants' authorized agents. At all relevant times, the Defendants were the manufacturers, distributors, warrantors, and/or sellers of the replacement parts and services

provided as part of the Recall Work.

269.     The Defendants are and were at all relevant times a merchant and seller of motor vehicles and parts and services within the meaning of the Uniform Commercial Code.

270.     Upon information and belief, the replacement parts provided as part of the Recall Work were not of an improved design and/or the services performed as part of the Recall Work did not remedy the defective valve springs and associated safety risks. To the contrary, the Recall Work is increasing the risk of harm and loss.

271.     The Defendants received notice of the defective replacement parts installed and services performed as part of the Recall Work by numerous consumer complaints made to dealers and distributors, and/or other public complaints and through its own testing and investigations. Affording the Defendants a reasonable opportunity to cure their breach of express warranties would be unnecessary and futile here because the Defendants knew of and concealed the defective Recall Work, and, upon information and belief, refused to repair or replace the defects and resulting damage within a reasonable time.

272.     As a direct and proximate result of Defendants' breach of express warranties, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

**COUNT FIVE**
**FRAUD**
**(On behalf of the Nationwide Class, or alternatively, all State Classes)**

273.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

274.     Plaintiffs bring this count on behalf of themselves and the State Classes and/or the National Class against all Defendants.

275.     Prior to November 1, 2018, Defendants knew, but intentionally concealed,

refused to disclose and/or fraudulently omitted from all of their disclosures to the public and NHTSA the fact that the Class Vehicles had a valve spring defect and thus were unsafe and un-merchantable.

276.   Defendants knew that the information about the defect and safety considerations was material to consumers and highly relevant to their purchasing decision.

277.   Had Defendants disclosed the defect when discovered, Plaintiffs and the Class Members would have either refused to purchase or lease the Class Vehicles or they would have paid lesser amounts to purchase or lease their Class Vehicles.

278.   Further, had Defendants disclosed the defect when discovered, the Class Vehicles could have been recalled and repaired under their five (5) year/60,000 mile express written warranties.  Defendants wrongfully concealed and omitted any disclosures about the defect until after the warranty periods had expired.

279.   At all times relevant, Defendants knew that replacing the valve springs was a significant and complex task that would take many labor hours and could lead to further problems and catastrophic failures of the engine.  Upon information and belief, Defendants fraudulently concealed and omitted the information about the valve spring defect because they hoped to avoid significant liability under their warranties.

280.   The Defendants affirmatively misrepresented to Plaintiffs and the members of the Classes in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles they were selling were reliable, safe to operate, engineered and manufactured with safety being a priority, had no significant defects, and would perform and operate properly when driven in normal usage.

281.   Defendants knew when they actively concealed or omitted the information about the defective valve springs that this information was material to consumers.

282.     Compared to the public, Defendants had exclusive, or at least far superior, knowledge about the defects in the valve springs.

283.     The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective valve springs.

284.     Defendants owed Plaintiffs and the Classes a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance by Defendants, because Plaintiffs and the other Class members relied on Defendants' material representations that the Class Vehicles were safe and reliable.  The aforementioned concealment and omissions were material because, if they had been disclosed, Plaintiffs and the other Subclass members would not have bought or leased the Class Vehicles or would not have bought or leased those Class Vehicles at the prices they paid.

285.     Plaintiffs and the other Class members relied on Defendants' representations and omissions in purchasing or leasing the Class Vehicles. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles and additional damages.

286.     As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiffs and all members of the State Classes have been damaged in an amount to be proven at trial.

**COUNT SIX**
**NEGLIGENT MISREPRESENTATION**
**(On behalf of the Nationwide Class, or alternatively, all State Classes)**

287. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

288. Plaintiffs bring this count on behalf of themselves and the State Classes and/or the National Class against all of the Defendants.

289. Defendants prepared and sent the Safety Recall Notices and Bulletins to Plaintiffs and the Classes. Upon information and belief, Defendants drafted these documents and/or provided the information material to these documents.

290. Defendants were obligated to exercise due care in drafting and disseminating the information in these documents.

291. By way of the Safety Recall Notices and Bulletins, and/or by other means of communication, Defendants negligently misrepresented to Plaintiffs that the Recall Work would remedy the valve spring defect and any attendant safety hazards. Defendants omitted any risks to the vehicle that could result from the Recall Work.

292. It was foreseeable that Plaintiffs and Class members would be harmed by the failure of Defendants to exercise reasonable care in making the above-referenced representations and omissions.

293. As a result of Defendants' negligent misrepresentations and omissions, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

**COUNT SEVEN**
**NEGLIGENCE**
**(On behalf of the Nationwide Class, or alternatively, all State Classes)**

294. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

295. Plaintiffs bring this count on behalf of themselves and the State Classes

and/or the National Class against all of the Defendants.

296. Upon information and belief, Defendants drafted and sent the Safety Recall Notices and Bulletins with repair instructions, included within Exhibits A and B, to their authorized dealers and other employees and agents. Defendants also sent the Safety Recall Notices and Bulletins to Plaintiffs and the members of the Classes.

297. Defendants owed a duty to the Plaintiffs and the Class members to exercise reasonable care in implementing the Recall and in overseeing, supervising, training, directing and/or instructing their authorized dealers and other employees and agents with regard to the Recall Work.

298. It was foreseeable that Plaintiffs and Class members would be harmed by the failure of Defendants to exercise reasonable care in implementing the Recall and in overseeing, supervising, training, directing and/or instructing their authorized dealers and other employees and agents with regard to the Recall Work.

299. Defendants breached their duty of care, and as a result, Plaintiffs and members of the Classes have been damaged in an amount to be proven at trial.

## COUNT EIGHT
## UNJUST ENRICHMENT
### (On behalf of all State Classes)

300. Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

301. Plaintiffs bring this count on behalf of themselves and the State Classes against the Defendants Subaru and TMS.

302. Subaru and TMS have received and retained benefits from Plaintiffs and the State Class members and inequity has resulted.

303. These Defendants have benefitted from selling and leasing defective cars

whose value was artificially inflated by Defendants' concealment of the defective valve springs. In addition, these Defendants have benefitted from Plaintiffs and the Class members having to pay for diagnostic testing, replacement engines and other repair costs resulting from the defective valve springs and the Recall Work.

304.     It is inequitable for Subaru and TMS to retain these benefits.

305.     Plaintiffs and the Class members were not aware of the true facts about the Class Vehicles, and did not benefit from Defendants' conduct; to the contrary, Plaintiffs and the Class members incurred significant losses as a result of Defendants' conduct.

306.     Subaru and TMS knowingly accepted the benefits of their unjust conduct.

307.     As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

308.     Plaintiffs, individually and on behalf of all the members of the State Classes, seek all relief permitted in accord with the proofs at trial.

**COUNT NINE**
**PROMISSORY ESTOPPEL**
**(On behalf of the Nationwide Class, or alternatively, all State Classes)**

309.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

310.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class and/or the State Classes against the Defendants Subaru and TMS.

311.     In providing the Recall Notices and other bulletins and information regarding the Recall Work to Plaintiffs and the members of the Classes, Defendants made promises that the Recall Work would properly correct the valve spring defect and eliminate the risk of engine failures and associated safety hazards concerning the valve springs in the Class Vehicles.

312.     Defendants represented that the Plaintiffs and members of the Classes were at risk if they did not have the Recall Work performed.   Indeed, Defendants warned Plaintiffs to have the Recall Work performed as soon as possible.  *See* Exhibits A and B.

313.     Defendants also made public statements after the recall was announced, including the statements set forth *supra* in paragraphs 9 and 11, encouraging Class members to bring their Class Vehicles in for the Recall Work and assuring them that the Defendants would stand behind the vehicles and the Recall Work.

314.     Plaintiffs and the members of the Classes reasonably and substantially relied upon the promises of Defendants to their detriment when they brought their Class Vehicles in for the Recall Work.

315.     Given the language in the Safety Recall Notices and statements made by Defendants, it was foreseeable that the Plaintiffs and Classes would rely upon it. Injustice and inequities can only be avoided by restoring losses suffered by Plaintiffs and the Classes resulting from their reliance upon Defendants' promises and the faulty Recall Work.

316.     Plaintiffs, individually and on behalf of all the members of the State Classes, seek all relief permitted in accord with the proofs at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiffs and the Classes, and award the following relief:

A.     An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B.      An order awarding declaratory relief and enjoining Defendants from continuing the conduct and practices alleged above and requiring Defendants to accept full liability and responsibility for the defective and inadequate Recall Work and resulting losses, inequities and damages;

C.      An order awarding costs, restitution, disgorgement, compensatory damages and out-of-pocket expenses in an amount to be determined at trial;

D.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

E.      An award of costs, expenses, and attorneys' fees as permitted by law and Federal Rule of Civil Procedure 23; and

F.      Such other or further relief as the Court may deem appropriate, just, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated: January 3, 2020                          Respectfully submitted,

/S/ Peter A. Muhic

_____

Peter A. Muhic
NJ ID No. 041051994
Peter H. LeVan Jr.
NJ ID No. 000431999
**LEVAN LAW GROUP LLC**
One Logan Square – 27th Floor
Philadelphia, PA 19103-6933
Tel: 215.561.1500
Fax: 215.827.5390
pmuhic@levanlawgroup.com
plevan@levanlawgroup.com

Katrina Carroll
NJ ID No. 026212000
**CARLSON LYNCH LLP**
111 W. Washington Street Ste. 1240
Chicago, IL 60602
Tel: 312.750.1265
kcarroll@carlsonlynch.com

Edwin J. Kilpela, Jr
James P. McGraw, III
**CARLSON LYNCH LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Tel: 412.322.9243
Fax: 412.231.0246
ekilpela@carlsonlynch.com
jmcgraw@carlsonlynch.com

Jonathan M. Jagher
Kimberly A. Justice
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6487
Facsimile: (224) 632-4521
jjagher@fklmlaw.com
kjustice@fklmlaw.com

William H. London
Douglas A. Millen
**FREED KANNER LONDON
& MILLEN, LLC**
2201 Waukegan Road, #130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
blondon@fklmlaw.com
dmillen@fklmlaw.com

David P. McLafferty
**MCLAFFERTY LAW FIRM P.C.**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 940-4000
Facsimile: (610) 940-4007
dmclafferty@mclaffertylaw.com

Richard R. Gordon
**GORDON LAW OFFICES, LTD.**
111 West Washington Street, Suite 1240
Chicago, Illinois 60602
Telephone: (312) 332-5200
Facsimile: (312) 242-4966
rrg@gordonlawchicago.com

*Attorneys for Plaintiffs and the Proposed Classes*